## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **ROBERT STEVENSON,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **3:20cv1518 (VLB)** |
| | : | |
| **COMMISSIONER ANGEL QUIROS,** | : | |
| **et al.,** | : | |
| **Defendants.** | : | |

### RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Robert Stevenson, who is a sentenced inmate currently in the custody of the Department of Correction ("DOC"),[1] brings this action under 42 U.S.C. § 1983, alleging his First and Fourteenth Amendment rights were violated when the DOC confiscated sexually explicit materials in Issues 17 and 18 of his *Phat Puffs Magazine*.  These claims are lodged against the following five DOC employees: 1) DOC Commissioner Angel Quiros in his official capacity, 2) Corrigan-Radgowski Correctional Center ("Corrigan") Warden Martin in his official capacity, 3) Administrative Remedies Coordinator King in her individual and official capacities, 4) Director of Security Santiago in his official capacity, and 5) Acting Director of Security Hartnett in his individual and official capacities.  Compl. [ECF No. 1]; IRO [ECF No. 10].

---

[1] The Court may "take judicial notice of relevant matters of public record."  *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012).  The publicly available information on the Connecticut DOC website that shows that Mr. Stevenson was sentenced on October 30, 2015 to term of incarceration that has not yet expired and that he is currently housed at MacDougall-Walker Correctional Institution.  *See* http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=405287.

On September 1, 2021, Defendants filed a motion for summary judgment on all claims along with a memorandum of law and a Local Rule 56(a)1 Statement. Defs.' Summ. J. Mem [ECF No. 29-1]; Defs.' Rule 56(a) [ECF No. 29-1].   In response, Mr. Stevenson only filed a declaration, which includes his responses to Defendants' Local Rule 56(a) Statement.   Pl.'s Decl. & Pl.'s Rule 56(a) [ECF No. 31]. He did not submit a memorandum of law.   Defendants thereafter filed a reply. Defs.' Reply [ECF No. 32].

After thorough review, Defendants' motion for summary judgment must be GRANTED.

## I.    MATERIAL FACTS

In deciding a motion for summary judgment, the Court may review the parties' Local Rule 56(a) Statements of Material Facts and supporting exhibits, including the plaintiff's declaration.   When a plaintiff does not file a Local Rule 56(a)2 Statement, as is the case here, the Court must deem as admitted all Local Rule 56(a)1 material facts that are supported by evidence.[2]   *See* D. Conn. L. Civ. R. 56(a)1; *Small v. Clements*, No. 3:18-CV-1731 (KAD), 2019 WL 5727388, at *1, n.1 (D. Conn. Nov. 5, 2019); *Wu v. Nat'l Geospatial Intel. Agency*, No. 3:14CV1603 (DJS), 2017 WL 923906, at *2 (D. Conn. Mar. 8, 2017) (noting in context of *pro se* plaintiff's failure to submit a Local Rule 56(a)2 statement, that "*pro se* parties are not excused from abiding by the Federal Rules of Civil Procedure") (citation omitted).   The

---

[2] Defendants informed Mr. Stevenson of this requirement in their Notice to *Pro Se* Litigant. *See* Notice [ECF No. 29-3].

2

Court may also review the plaintiff's verified complaint at the summary judgment stage.   *See Patterson v. Cty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (holding that a verified pleading that contains "allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment."); *see Jordan v. LaFrance*, No. 3:18-CV-1541 (MPS), 2019 WL 5064692, at *1 n. 1, *4 (D. Conn. Oct. 9, 2019) (noting that court may review allegations of verified complaint in consideration of motion for summary judgment). The Court concludes that the below facts are not in dispute.

A.   <u>The Parties</u>

This case involves the DOC Media Review Board's confiscation of sexually explicit material in two of Mr. Stevenson's *Phat Puffs Magazine* Issues.   During 2020 (the relevant time period), Mr. Stevenson was housed in DOC custody at Corrigan.   Defs.' Rule 56(a) at ¶ 2.   Also during the relevant time, Defendant King, a Corrigan Counselor, served on the Media Review Board ("MRB") as a Corrigan representative, *see id.* at ¶ 3, and Defendant Hartnett served as the Deputy Warden of DOC's Security Division and as the Director of Security's designee to review and adjudicate appeals filed by inmates challenging a decision of the MRB, *id.* at ¶ 4. The remaining Defendants—Warden Martin and Director of Security Santiago— hold leadership positions but are not otherwise participants in the relevant conduct.   *See generally* Compl.

3

**B.**   **Applicable Administrative Directives**

Two DOC Administrative Directives are relevant to the case here.   First is Administrative Directive 10.7, which regulates the distribution of publications sent to inmates and permits the confiscation of material that "adversely affect[s] a valid penological interest."   A.D. 10.7, Defs.' Summ. J. Ex. G [ECF No. 29- 10].   Second is Administrative Directive 9.6, which regulates inmates' grievances and appeals of DOC actions.

**1.**   *Administrative Directive 10.7*

Inmates in DOC custody are generally permitted to order and receive publications that contain sexual content or content that is "unpopular or repugnant."   *Id.* at § 10.7(4)(N)(1).   The distribution of such is limited when a publication is "determined to be detrimental to the security, good order, or discipline of the facility or which may facilitate criminal activity."   *Id.* at § 10.7(4)(N)(1).   Content that falls within this category includes "sexually explicit material, either pictorial or written, which by its nature or content poses a threat to the security, good order, or discipline of the facility, facilitates criminal activity or harasses staff."   Defs.' Rule 56(a) at ¶¶ 6, 7; A.D. 10.7(4)(N).   Administrative Directive 10.7 prohibits distribution of written material that contains the following subjects: "1) sado-masochistic 2) bestiality; 3) involving minors; or 4) materials depicting sexual activity which involves the use of force or without the consent of one or more parties."   Defs.' Rule 56(a) at ¶ 6; A.D. 10.7(4)(N)(g)(2).

In addition to establishing the types of written material that must be excluded from distribution, Administrative Directive 10.7 establishes the DOC procedure for reviewing publications.  Defs.' Rule 56(a) at ¶ 13; *see* A.D. 10.7(4)(N)(1).  First, the facility's Unit Administrator or designee determines whether material is sexually explicit and should be rejected or confiscated.  *See* A.D. 10.7(4)(N)(1)(g).

Second, the MRB reviews the Unit Administrator's initial decision.  *See id.* The MRB meets twice per month and vote on the admissibility of all objectionable materials.  Defs.' Rule 56(a) at ¶ 15.  If the MRB concludes that five or fewer pages of a publication other than a book are objectionable, the objectionable pages are removed and the remainder of the publication is permitted.  *Id.*  However, if the MRB concludes that six or more pages of a publication other than a book contain objectionable material, the entire publication is rejected.  *Id.* at ¶ 16.

After each meeting, notice of the MRB's decision concerning the publications reviewed is issued to the inmate population and to all DOC facilities. *Id.* at ¶ 17.  If a publication is rejected, either in whole or in part, facility staff issues a Publication Rejection Notice to the affected inmate or inmates, indicating the rejected materials and the reason for such rejection.  *Id.* at ¶ 18.  Facility staff also issue a Publication Rejection Notice to advise the publisher that it may seek an independent review of the rejection by writing to the Commissioner or designee within 15 days of receipt of the rejection notice.  *Id.* at ¶ 20.  The MRB's decision is also uploaded to a centralized database that contains a list of publications that

have received MRB review and is accessible to staff at each DOC facility reviewing incoming publications.   *Id.* at ¶ 21.

Facility staff use this database to cross-check new publication arrivals with previous MRB review.   *Id.* at ¶ 22.   There are three possible outcomes for a new arrival: (1) if the publication has previously been reviewed and <u>approved</u> by the MRB, the publication will be permitted into the facility; (2) if the publication has previously been reviewed and <u>rejected</u>, facility staff will issue a Publication Rejection Notice and the inmate will have the ability to appeal the rejection;   or (3) if a publication has <u>not been reviewed</u> by the MRB, facility staff will forward the publication to the MRB representative at the particular DOC facility, who will determine whether it can be approved without review by the MRB or whether it needs review, in which case it will be forwarded to the MRB.   *Id.* at ¶¶ 22-24.

Deputy Warden Hartnett avers that keeping written sexually explicit material depicting sexual activity involving the use of force, sexual activity without consent, and/or sado-masochism out of DOC facilities furthers penological interests in rehabilitating offenders, maintaining secure and orderly facilities, and maintaining a non-hostile or offensive work environment.   *Id.* at ¶ 9.   He explains that such written sexually explicit materials can be counterproductive to these penological goals because such materials sensationalize sexual violence (especially violence against women), which may lead to hostility towards and objectification of women; an increased likelihood of aggression and future violence, including sexual aggression and violence; and a hyper-sexualized environment and increased

6

harassment or violence against staff, especially female staff. *Id.* at ¶¶ 9-12; *see* Hartnett Decl., Defs.' Summ. J. Ex. C [ECF No. 29-6] at ¶¶ 11-13.

## 2. *Administrative Directive 9.6*

When an inmate appeals the MRB's rejection of any portion of a publication, his appeal is governed by the procedure outlined in Administrative Directive 9.6, *see* A.D. 10.7(4)(N)(g)(2), which sets forth the grievance procedure for "any issue relating to policy and procedure, and compliance with established provisions," A.D. 9.6, Defs.' Summ. J. Ex. F [ECF No. 29-9] at 9.6(6).

<u>First</u>, an inmate must seek informal resolution prior to filing a grievance. *See* A.D. 9.6(6)(A). But when verbal resolution is not possible, "the inmate shall submit a written request via CN 9601, Inmate Request Form." *Id.* Administrative Directive 9.6(6)(C) specifically states that the inmate must include a copy of the Inmate Request Form (CN 9601) with the grievance (CN 9602) or an inmate must explain its absence. *See* A.D. 9.6(6)(C).

The Level-1 Grievance must be filed within thirty calendar days from the date of the occurrence or discovery of the cause of the Grievance and should include a copy of the response to the written request to resolve the matter informally or explain why the response is not attached. *See* A.D. 9.6(6)(C). The Unit Administrator shall respond in writing to the Level-1 Grievance within thirty business days of his or her receipt of the Grievance. *See* A.D. 9.6(6)(I).

<u>Second</u>, upon the disposition of the Level-1 Grievance by the Unit Administrator <u>or</u> the Unit Administrator's failure to dispose of the grievance in a

timely manner, the inmate may appeal to Level 2.   *See* A.D. 9.6(6)(G), (I) & (K).   A grievance returned without disposition due to a failure to comply with procedural requirements of Administrative Directive 9.6 may not be appealed.   *See* A.D. 9.6(6)(G).

A Level-2 Appeal of a disposition of a Level-1 Grievance must be filed within five calendar days from the inmate's receipt of the decision on the Level-1 Grievance.   *See* A.D. 9.6(6)(K).   The Level-2 Appeal of the Unit Administrator's failure to dispose of the Level-1 Grievance in a timely manner must be filed within 65 days from the date the Level-1 Grievance was filed by the inmate.   *See* A.D. 9.6(6)(M).

Level-2 Appeals filed by inmates confined in Connecticut correctional facilities are reviewed by the appropriate District Administrator.   A.D. 9.6(6)(K). The District Administrator is required to respond to the Level-2 Appeal within thirty business days of receipt of the appeal.   *See id.*

**Third**, the resolution of an inmate's Level 2 appeal renders the appeal final.[3] *See id.*

C.   Relevant Publications

*Phat Puffs Magazine* is a publication that contains sexual material.   Defs.' Rule 56(a) at ¶¶ 26-27.   Inmates in DOC custody regularly order *Phat Puffs Magazine* Issues.   *See id.*   Since August 2016, DOC has permitted numerous *Phat*

---

[3] In limited circumstances—i.e., challenges to department policy, the integrity of the grievance procedure or Level-2 Appeals to which there has been an untimely response by the District Administrator—an inmate must go pursue a "Level 3 appeal" rather than a Level 2 appeal. *See* A.D. 9.6(6)(L).   These circumstances do not apply here.

*Puffs Magazine* Issues into its facilities, and the MRB has approved more than it has rejected.   *Id.* at ¶ 27.

The covers of the two *Phat Puffs Magazine* Issues relevant to this action—the *Winter 2020 Issue 17* and *Summer 2020 Issue 18*—list the interior content as featuring one hundred pages of "THE HOTTEST LADIES AND EVENTS[;]" answers to "bold sexual questions[;]" models, strippers, housewives, porn stars, and strip club events; and "real player tips."   *See* Winter 2020 & Summer 2020, Defs.' Summ. J. Exs. L & M [ECF Nos. 15 & 16] (emphasis in original).

       1.   *Phat Puffs Winter 2020 Issue 17*

In January 2020, the MRB determined that the *Phat Puffs Winter 2020 Issue 17* contained five pages of written sexually explicit material that should be excluded under Administrative Directive 10.7.   Defs.' Rule 56(a) at ¶ 30.   These five pages included material referencing sado-masochism; sexual activity without consent; and sexual activity involving the use of force, including bondage, rape, slapping/hitting women, and choking women.   *Id.* at ¶ 31; *see* Winter 2020 at 4-8; Pl.'s Grievances, Defs.' Summ. J. Ex. I [ECF No. 29-12] at 8-9.

On July 14, 2020, Defendant King issued Mr. Stevenson a Publication Rejection Notice for *Phat Puffs Winter 2020 Issue 17*, indicating that the MRB removed five pages containing sexually explicit material prohibited by Administrative Directive 10.7.   Defs.' Rule 56(a) at ¶ 29; Pl.'s Grievances at 8.

After Mr. Stevenson received his *Phat Puffs Winter 2020 Issue 17*, he filed an appeal dated July 16, 2020.   Defs.' Rule 56(a) at ¶ 33.   Mr. Stevenson's appeal stated:

> On July 15, 2020 I got 1 of my 2 magazines Phat Puff #17 with a rejection notice[.]   Now on the notice they checked off #7 on it and they said and rip[p]ed out 16, 17, 29, 41 & 73 because they have "visual depiction of sexual activity or nudity" but Phat Puff is a non-nude magazine[.]   I have a bunch of Phat Puff magazine[s] that have no pages ripped out[.]   [W]hoever ripped the pages out didn't give a detail explanation of the reason of reject[.]   They just put the page number[.]   [A]lso they didn't follow the guide lines of 18-91-39 because the magazine doesn't have criminal activity or harasses staff[,] doesn[']t have nudity or visual depiction of sexual[] activity[.]   Pictorial depiction of nudity is defined as []visual depiction or display of genitalia, public region, anus, or female breast where areola is visible and not completely and opaquely covered and the Phat Puff brand doesn[']t show none of these things[.]

Pl.'s Grievances at 7.   He requested a replacement of his "damage[d] property because ripping out pages without no legit[imate] reason" and he had "payed [sic] for a non-nude Magazine that has nothing that 18-31-39 is against[.]"   *Id.*

Director of Security's designee, Defendant Hartnett, reviewed and responded to Mr. Stevenson's appeal.   Defs.' Rule 56(a) at ¶ 34.   Defendant Hartnett upheld the rejection on the basis that the five pages were properly removed as they contained interview commentary concerning sado-masochism and sexual activity involving the use of force.   *Id.* at ¶ 35; Hartnett Decl. at ¶¶ 39-40; Pl.'s Grievances at 9.   In a letter dated August 21, 2020, Hartnett explained the partial rejection of his *Phat Puffs Magazine Issue 17* was due to written material, specifically interview commentary, on five pages that "contain[ed] subject matter

related to sado-masochism and sexual activity involving the use of force."   Rule 56(a) at ¶ 36; Hartnett Decl. at ¶ 36, 40; Pl.'s Grievances at 9.

### 2.   *Phat Puffs Magazine Summer 2020 Issue 18*

On July 28, 2020, Defendant King issued Mr. Stevenson a Publication Rejection Notice for *Phat Puffs Summer 2020 Issue 18*, indicating the MRB determined the Issue could not be distributed, because it contained more than five pages of sexually explicit material prohibited by Administrative Directive 10.7. Defs.' Rule 56(a) at ¶¶ 38-39; s*ee* Summer 2020 at 4-14; Pl.'s Grievances at 5.

Mr. Stevenson appealed the Rejection Notice on July 28, 2020*.* Defs.' Rule 56(a) at ¶ 45.   In his appeal, Mr. Stevenson stated:

> On 7-28-20 I received a rejection notice of Phat Puff #18 in it[s] entirety[.] I have 8 Phat Puff magazine[.] Some have all the pages in and some don't[.] [T]hey are made from the same Publisher (Sub O Ent. Inc)[.]   [I]t is a non-nude magazine[.] [R]ejecting the entirety of it because of criteria 7 is not a legitimate reason because I have 8 Phat Puff Magazine that I can show as evidence and they been accepted in this facility[.]   [A]lso you did not give a detailed explanation of reason for rejection[.]   "See above" is not one. Prison officials is to follow rules and rejecting #18 and [l]etting 17, 16, 15 in is not [following the rules] because they are from the same Publisher (Sub O Ent Inc).[4]

Pl.'s Grievances at 3.   He requested that he "get issue #18 in its entirety because it doesn't meet any criteria" as *Phat Puffs* a "is a non-nude magazine."   *Id.*   He stated further he has "8 magazines to prove it and most are in its entirety."   *Id.*

---

[4] Mr. Stevenson indicates that *Issue 15* and *Issue 16* have been permitted in their entirety. *Id.*

On August 12, 2020, Defendant Hartnett notified Mr. Stevenson that the MRB conducted an independent review but his appeal was denied.   Defs.' Rule 56(a) at ¶ 45.   Hartnett's letter explained:

> Based on your appeal, this publication has been reevaluated.   A review of the written content of this issue of the magazine revealed 11 pages where interview questions and subsequent answers were specific to sexual activity involving[:]  punching, choking, slapping, hair pulling, and spitting. . . . Written content of this type is prohibited.   Because there are more than (5) pages of rejectable content, the magazine has been rejected in its entirety.

Hartnett's Decl. at ¶ 30; Pl.'s Grievances at 5.

### 3.   *Letters to Penthouse*

*Letters to Penthouse* is a publication that contains sexually-related material, and it distributes multiple Issues each year, which are purchased by inmates in DOC's custody.   Defs.' Rule 56(a) at ¶ 47.   Like *Phat Puffs Magazine*, it has been reviewed on numerous occasions by the MRB and Issues have both been approved and rejected.   *Id.* at ¶ 48.   Since August 2016, *Letters to Penthouse* and *Phat Puffs Magazine* have been approved by the MRB at similar rates, although *Phat Puffs Magazine* has a slightly higher approval rate.   *Id*.

## II.   LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   The moving party bears the burden of proving that no genuine factual disputes exist.   *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).   "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that

12

could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).   This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-00481, 2004 WL 2472280, at *4 (D. Conn. Oct. 20, 2004) ("At the summary judgment stage of the proceeding, [the moving party is] required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.") (citing *Gottlieb*, 84 F.3d at 518); *Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011).   Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."   *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible."   *Gottlieb v. Cnty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).   Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists

of conclusory assertions without further support in the record, summary judgment may lie.  *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010).

### III.   DISCUSSION

Defendants move for summary judgment on both the First and Fourteenth Amendment claims.   With respect to the First Amendment claims, Defendants argue that it fails on the merits.   As for the Fourteenth Amendment claims, Defendants makes three arguments: 1) that Mr. Stevenson has failed to exhaust his administrative remedies in compliance with the Prison Litigation Reform Act ("PLRA"); 2) that the claims fail on the merits, and 3) that Mr. Stevenson does not have standing to raise third-party injuries.   Defendants last argue they are entitled to qualified immunity on official capacity injunctive relief claims.   Defs.' Mem. at 12-39; Defs.' Reply at 6-10.

### A.   <u>First Amendment</u>

"[C]onfinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration."   *Jones v. North Carolina Prisoners' Lab. Union*, 433 U.S. 119, 125 (1977).   "A prison inmate, therefore, retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."   *Giano v. Senkowski*, 54 F.3d 1050, 1053 (2d Cir. 1995).   Thus, "[w]hen a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to

protect constitutional rights.'"  *Turner v. Safley,* 482 U.S. 78, 84 (1987) (internal quotation marks omitted).

"Deference should be accorded to decision-making in the corrections system because courts are 'ill equipped to deal with the increasingly urgent problems of prison administration and reform' and '[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government.'"  *Reynolds v. Quiros*, 25 F. 4th 72, 83 (2d Cir. 2022) (quoting *Turner*, 482 U.S. at 84–85).  Thus, "the appropriate standard of review is 'reasonableness.'"  *Id.*   "[T]he burden of proof is 'not on the State to prove the validity of prison regulation but on the prisoner to disprove it.'"  *Reynolds*, 25 F. 4th at 84 (quoting *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)).

In reviewing the validity of prison regulations, courts apply the factors laid out by the Supreme Court in *Turner v. Safley*: (1) whether there is a "valid, rational connection" between the regulation and the legitimate government interest put forward to justify it; (2) whether inmates have alternative means of exercising the burdened right; (3) what impact accommodating the right would have on guards, other inmates, and prison resources generally; and (4) how the regulation compares to proposed alternatives.  482 U.S. at 89; *see also Johnson v. Goord*, 445 F.3d 532, 535 (2d Cir. 2006); *see Shakur v. Selsky*, 391 F.3d 106, 113 (2d Cir. 2004).

Earlier this year, the Second Circuit ruled in *Reynolds v. Quiros* that Administrative Directive 10.7's regulation of sexually explicit material does not violate inmates' First Amendment rights.   The DOC had offered the following justifications: "(1) ensuring the safety and security of prisons; (2) encouraging the rehabilitation of inmates; and (3) promoting a non-hostile and less offensive work environment for DOC employees."   *Reynolds*, 25 F. 4th at 84.   The Second Circuit addressed all four *Turner* factors and found the regulations facially reasonable. *See id.* at 95. While *Reynolds* dealt with Administrative Directive 10.7's regulation of pictorial images, the Second Circuit acknowledged that the "written material" prohibition—excluding <u>only</u> sado-masochism, bestiality, conduct involving minors, and sexual activity involving the use of force or without consent—is less restrictive than the "pictorial depictions" prohibition that also prohibits depiction of sexual intercourse, masturbation, and bodily functions.   *Id.* at 81.   The broad *Reynolds* holding, that Administrative Directive 10.7 is constitutional, therefore applies to this case here.

Courts have recognized that the *Turner* factors apply to both facial and as-applied challenges.   *See, e.g., Azukas v. Arnone*, No. 3:14-CV-721 (RNC), 2017 WL 1282196, at *2 (D. Conn. Mar. 31, 2017) (citing *United States v. Reid*, 369 F.3d 619, 626 (1st Cir. 2004)); *Henderson v. Hembrook*, 18-CV-6091-FPG, 2021 WL 365925 (W.D.N.Y. Feb. 3, 2021).   *Reynolds* forecloses a facial challenge, but Mr. Stevenson has alleged an "as applied" First Amendment challenge to the Defendants' treatment of his *Phat Puffs Magazine Issue 17* and *Issue 18*.   *See* IRO at 8.

16

Defendants argue the evidence demonstrates that Mr. Stevenson's two *Phat Puffs Magazine* Issues were rejected based on written sexually explicit material under the relevant provisions of Administrative Directive 10.7 that are reasonably related to DOC's interests in offender rehabilitation, secure and orderly facilities, and a non-hostile work environment for correctional staff.   Accordingly, the Court considers the *Turner* factors as applied to the *Phat Puffs Issue Magazine Issue* 17 and *Issue 18* to determine whether Defendants' regulation of Mr. Stevenson's First Amendment rights was reasonably related to penological interests.

        1.    *Legitimate Penological Justification*

The first *Turner* factor is "multifold" and requires proof that "the governmental objective underlying the regulations at issue is [1] legitimate, and [2] neutral, and that [3] the regulations are rationally related to that objective." *Thornburg v. Abbott*, 390 U.S. 401, 414 (1989).

Defendants have proffered evidence in support of their assertion that keeping out of DOC facilities written sexually explicit material—involving the use of force, sexual activity without consent, and/or sado-masochism which sensationalizes sexual violence—furthers the penological interests in inmate rehabilitation, security, and a non-hostile work environment because such material can create a sexually-charged environment, lead to increased inmate aggression, and increased likelihood of acts of violence or sexual violence against inmates and staff.   Defs.' Rule 56(a) at ¶¶ 7-12; Hartnett Decl. at ¶¶ 11-13.   In its recent decision, the Second Circuit affirmed that DOC's ban of sexually explicit materials

17

under 10.7 was reasonably related to furthering inmate rehabilitation, preventing inmate aggression and violence, and promoting a non-hostile work environment. *Reynolds*, 25 F. 4th at 85-92.[5]

Here, the irrefutable evidence, which the Court has reviewed, is that the five pages removed from the *Phat Puffs Magazine Winter 2020 Issue 17* contained interview commentary referencing sado-masochism, sexual activity without consent, and sexual activity involving the use of force.   *See* Defs. Rule 56(a) ¶ 31. The evidence also shows that the *Phat Puffs Magazine Summer 2020 Issue 18* contained more than five pages with interview questions and answers referencing sado-masochism and sexual activity involving the use of force.   Defs.' Rule 56(a) at ¶ 40.

Mr. Stevenson has not adduced evidence to raise an inference that Defendants' treatment of his *Phat Puffs Issues 17 and 18* was not reasonably related to DOC's valid penological interests in inmate rehabilitation, safety and security, and a non-hostile work environment.   Absent any evidence to the contrary, the Court concludes that Defendants' treatment of Mr. Stevenson's *Phat Puffs Magazine Issue 17* and *Phat Puffs Magazine Issue 18* was rationally related

---

[5] The first *Turner* factor also requires that the legitimate governmental objective be "neutral."   *Turner*, 482 U.S. at 90.   The *Reynolds* Court affirmed the "neutrality" of DOC's objectives through Administrative Directive 10.7 that are "unrelated to the suppression of expression—*i.e.,* protecting DOC staff from a hostile work environment, ensuring the safety and security of DOC facilities, and facilitating the rehabilitation of sex offender inmates."   *Reynolds*, 25 F. 4th at 91-92.   Mr. Stevenson has not adduced any evidence suggesting that Defendants lacked a neutral objective unrelated to the suppression of expression in their treatment of his *Phat Puffs Magazine Issues 17* and *Issue 18*.

to Defendants' legitimate penological interests in inmate rehabilitation, security and a non-hostile work environment.

### 2. *Alternative Avenues of Expression*

For the second factor, the Court must assess whether "there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90.   Relevant to Administrative Directive 10.7's restrictions on sexually explicit materials, the Second Circuit has defined the right at issue "sensibly and expansively" and "allow[ing] for flexibility in determining what qualifies as another means of expression" as the "right to receive sexually explicit communications." *Reynolds*, 25 F. 4th at 92 (quoting *Giano*, 54 F.3d at 1055) (other citations omitted).

Under this factor, the Court considers the alternatives for Mr. Stevenson's exercise of his right to receive sexually explicit communications, which is implicated by Defendants' restrictions on his two Issues of *Phat Puffs Magazine*. The alternatives for exercising a restricted right need be available but not ideal. *See Overton*, 539 U.S. at 135.   Under Administrative Directive 10.7, an inmate such as Mr. Stevenson may receive pictorial materials containing sexual content that are not within the definition of "sexually explicit" or that "taken as a whole, are literary, artistic, educational or scientific in nature."   *Reynolds*, 25 F. 4th at 92; A.D. 10.7(4)(N)(1)(g)(1)-(2).   As this Court has previously noted, an inmate may receive both "sexually graphic written notes" and "romantic letters" or "sexually explicit written materials so long as it does not threaten the 'security, good order, or discipline' of a facility by, for instance, depicting sado-masochism, bestiality, child

19

sexual activity, or forceful sexual activity."   *See Reynolds v. Cook*, No. 3:13-CV-388 (SRU), 2020 WL 1140885, at *20 (D. Conn. March 9, 2020) (quoting A.D. 10.7(4)(N)((1)(g)(2)).

Moreover, it is not disputed that more Issues of *Phat Puffs Magazine* have been approved than rejected and that Mr. Stevenson has received numerous Issues of *Phat Puffs* throughout his incarceration.   *See* Defs.' Rule 56(a) at ¶ 27; Pl.'s Grievances at 3.   Accordingly, the Court concludes that Defendants' treatment of *Phat Puffs Magazine Issue 17* and *Issue 18* did not leave Mr. Stevenson without other available avenues to exercise his right to receive sexually explicit communications.   Thus, the second *Turner* factor weighs in favor of Defendants.

### 3.    *Impact of Accommodating the Asserted Right*

For this third factor, the Court evaluates the impact of accommodating the asserted constitutional right "on guards and other inmates, and on the allocation of prison resources generally."   *Turner*, 482 U.S. at 90.   "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials."   *Id.*; *see also Thornburgh*, 490 U.S. at 418 ("Where … the right in question can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike, the courts should defer to the "informed discretion of corrections officials[.]") (internal citations and quotations omitted).

20

Upon reviewing the *Reynolds* record, the Second Circuit observed that "prior to the implementation of A.D. 10.7 in 2012, the inmate right at issue was being exercised with significant costs to the work environment of DOC staff and with risk to the safety and security of staff and inmates alike, as well as the rehabilitation of sex offender inmates."   *See Reynolds*, 25 F. 4th at 93.   There is no evidence that providing him with the objectionable sexually explicit material under Administrative Directive 10.7 <u>would not</u> be detrimental to protecting staff from a hostile work environment, ensuring the safety and security of DOC facilities, and promoting inmate rehabilitation.   Accordingly, the third *Turner* factor weighs in favor of Defendants.

### 4.   *Existence of Ready Alternatives*

"The Fourth *Turner* factor considers whether there are easily available alternative to the regulation."   *Reynolds*, 25 F. 4th at 93.   This factor is not a "'least restrictive' alternative test" and "[p]rison officials do not have to set up and then shoot down every conceivable method of accommodating the claimant's constitutional complaint."   *Turner*, 482 U.S. at 90.   "[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* costs to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard."   *Id.*   "The existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns."   *Id.* at 91.

With respect to *Phat Puffs Magazine Issue 17* and *Issue 18,* there is no evidence that any "obvious, easy alternative" could "fully" accommodate his rights at a *de minimis* cost to valid penological interests.   *See Turner*, 482 U.S. at 90. Indeed, Administrative Directive 10.7 requires the MRB to review specific content— it does not permit categorical restrictions of publications without review.   It is only when the number of pages with impermissible content rises to six pages does the policy permit the rejection of entire magazines, a reasonable balance giving an inmate the opportunity to exercise his right to view sexually explicit material while also preventing excessive use of administrative resources.   This is a measured and rational solution that gives Mr. Stevenson the opportunity to review ample other publications.   He has not provided evidence of another, workable solution with *de minimis* costs to the DOC.   Accordingly, based on the present record, there is no inference that Defendants' treatment of Mr. Stevenson's *Phat Puffs Magazine Issue 17* and *Issue 18* under Administrative Directive 10.7 was an exaggerated response to prison concerns.

In sum, the four *Turner* factors weigh in Defendants' favor.   The present record shows that Defendants' treatment of Mr. Stevenson's two Issues of *Phat Puffs Magazine* under Administrative Directive 10.7 was reasonably related to the valid penological goals of protecting staff from a hostile work environment, ensuring the safety and security of DOC facilities, and promoting inmate rehabilitation.   Mr. Stevenson has failed to raise any genuine dispute as to any material fact relevant to the merits of his First Amendment claims.   Thus, based

22

on the present record, the Court GRANTS Defendants' motion for summary judgment on the merits of Mr. Stevenson's First Amendment claim.

    **B.**    <u>**Fourteenth Amendment**</u>

    The Fourteenth Amendment's Equal Protection Clause requires that similarly situated persons be treated the same. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40 (1985). To state an equal protection claim, a plaintiff must allege facts showing that: (1) he was treated differently from similarly situated individuals and (2) that the difference in or discriminatory treatment was based on "'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000). Absent allegations to support "class-based" discrimination, an individual may state an equal protection claim by alleging that he or she has been intentionally and "irrationally singled out as a . . . class of one." *Engquist v. Or. Dep't of Agric.,* 553 U.S. 591, 601 (2008). A plausible class-of-one claim requires the plaintiff to demonstrate an "'extremely high degree of similarity'" with the person to whom he or she is comparing himself or herself. *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) .

    In his complaint, Mr. Stevenson asserts that his Fourteenth Amendment rights were violated when Defendants rejected his Black-owned publications but approved white-owned publications that had the same style and content form. *See* Compl. at 8 (¶¶ 4-7). Mr. Stevenson alleges that Defendants King and Hartnett

23

permitted other publications with material concerning sex and security issues written by white authors (including, *inter alia*, James Patterson, Jackie Collins, and Vince Flynet) into the facility and included these publications in the prisoner's library; and that they have allowed the sexually explicit, white-owned publication of *Letters to Penthouse* into the facility.   *Id.* at 5 (¶¶ 6-9).   The Court permitted Mr. Stevenson to proceed on his equal protection class based theories of racially discriminatory treatment and a class-of-one.   *See* IRO at 10.

Defendants argue summary judgment should be granted for three reasons. First, Mr. Stevenson did not exhaust his administrative remedies regarding his Fourteenth Amendment claim.   Second, Mr. Stevenson fails to state a claim upon which relief may be granted.   Third, Mr. Stevenson does not have standing to bring these claims on behalf of *Phat Puffs Magazine*.

1.   *Defendants' First Argument: Exhaustion of Administrative Remedies*

The PRLA, which governs actions brought by prison inmates, requires a prisoner to exhaust administrative remedies prior to filing a federal lawsuit regarding prison conditions.   42 US.C. § 1997e(a).   A claim is not exhausted until the inmate complies with all administrative deadlines and procedures.   *See Woodford v. Ngo*, 548 U.S. 81, 90 (2006).   Informal efforts to put prison officials on notice of inmate concerns do not satisfy the exhaustion requirement.   *See Marcias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).   If the deadline to file a grievance has passed, an unexhausted claim is barred from federal court.   *See Woodford*, 548 U.S. at 95.   Thus, "untimely or otherwise procedurally defective attempts to secure

administrative remedies do not satisfy the PLRA's exhaustion requirements." *Ruggiero v. County of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) (quoting *Woodford*, 548 U.S. at 83–84).

Defendants maintain that Mr. Stevenson failed to exhaust his administrative remedies prior to filing this action on his equal protection claims of discriminatory conduct under either Administrative Directive 9.6(6) (the grievance process) and/or 9.6(13) (the appeal process when unacceptable correspondence is rejected). The Court agrees.

> i.   **Mr. Stevenson Did Not Exhaust His Remedies Under Administrative Directive 9.6 With Respect to His Fourteenth Amendment Claim.**

Failure to exhaust is an affirmative defense under the PLRA. *See Jones v. Bock*, 549 U.S. 199, 217 (2007). The defendant bears the burden to prove that an inmate did not exhaust his or her remedies prior to filing the action in court. *See Johnson v. Mata*, 460 Fed. App'x 11, 15 (2d Cir. 2012) ("The defendants have the burden of showing that there is no genuine issue of material fact as to exhaustion that would preclude summary judgment.").

The purpose of the exhaustion requirement is to give the DOC an opportunity to address the issue before a lawsuit is filed. The Supreme Court has explained:

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).

25

*Woodford*, 548 U.S. at 90 (citation and internal quotation marks omitted). Therefore, the inmate must provide sufficient information to put prison officials on notice   of claims that could be filed in federal court.   *See Baltas v. Rivera*, No. 3:19CV1043 (MPS), 2020 WL 6199821, at *8 (D. Conn. Oct. 22, 2020) ("Because the exhaustion requirement is intended to afford officials an opportunity to address the issue internally, . . . the inmate must include sufficient information to enable prison officials to address the same claim asserted in federal court."); *Garcia v. Univ. of Connecticut Health Care Ctr.*, No. 3:16CV852 (JCH), 2018 WL 5830840, at *6 (D. Conn. Nov. 7, 2018) (stating plaintiff failed to exhaust retaliation claims where his grievance contained no factual information as to the claim and indicated only that he was "placed in restraint in retaliation for his conduct.").

Here, Mr. Stevenson's appeals of the MRB decisions failed to provide any notice to the DOC of his Equal Protection claims.   Mr. Stevenson timely filed his appeals of the MRB decisions under Administrative Directive 9.6(13) relevant to his *Phat Puffs Winter Magazine Issue 17* and *Issue 18*.   *See* Pl.'s Grievances at 2-3, 6-7.   But the appeals were limited to two arguments: (1) previous *Phat Puffs Magazine* Issues were given to him in their entirety, and (2) Defendants did not sufficiently explain the reason for rejecting content.   *See* Pl.'s Grievances at 3, 7. Mr. Stevenson argued the content was permissible because *Phat Puffs Magazine* is a "non-nude magazine."   *Id.*   Mr. Stevenson's appeals never mention he was treated differently from any other inmate, let alone that he was discriminatorily treated based on race, as he now contends.

26

Defendants have also submitted undisputed evidence, including the declaration from Administrative Remedies Coordinator Michael Lyle, demonstrating that Mr. Stevenson filed other grievances (not including his appeals of the MRB decision) under Administrative Directive 9.6(6) while confined at Corrigan between July 1, 2020 through October 20, 2020.   Defs.' Rule 56(a) at ¶¶ 61-62; *see* Lyle Decl., Defs.' Summ. J. Ex. D [ECF No. 29-7], at ¶¶ 10-14.   None of these grievances complained of discriminatory conduct relating to the MRB's review of the *Phat Puffs Magazine* Issues.[6]   Defs.' Rule 56(a) at ¶ 61; Pl.'s Additional Grievances, Defs.' Summ. J. Ex. E [ECF No. 29-8]; Pl.'s Rule 56(a) at ¶ 61.   Nor does Mr. Stevenson dispute that he failed to file any other grievances under Administrative Directive 9.6 during this period.   Defs.' Rule 56(a) at ¶ 62; Pl.'s Rule 56(a) at ¶ 62.

Accordingly, the undisputed evidence shows that Mr. Stevenson has not exhausted his Equal Protection Claims through his challenges to the MRB decision under Administrative Directive 9.6.

> ii.   Mr. Stevenson Has Not Provided Evidence Showing His Remedies Were Unavailable.

Even if a remedy is "officially on the books," the exhaustion requirement may be excused when the remedy is not available in practice.   *Ross v. Blake*, 578 U.S. 632, 642-643 (2016) ("[A]n inmate is required to exhaust those, but only those,

---

[6] In these appeals, Mr. Stevenson complained about rejected grievances concerning the lack of halal food, loss of his job, and his request for single cell status.   Pl.'s Additional Grievances at 3-4, 6-7, 9-10.

grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'")   In other words, where a defendant satisfies its burden to show the plaintiff failed to exhaust administrative remedies, a plaintiff can nonetheless defeat summary judgment by presenting evidence that the exhaustion process was unavailable.   *See Hudson v. Kirkey*, No. 920CV0581 (LEK/DJS), 2021 WL 1966721, at *3 (N.D.N.Y. May 17, 2021) (explaining that once defendant introduces evidence of a functional grievance system, plaintiff could not survive summary judgment without submitting competent evidence to indicate unavailability); *Brooks v. Mullen*, No. 14-CV-6690-FPG, 2020 WL 6158614, at *5 (W.D.N.Y. Oct. 21, 2020) (citations omitted).

The United States Supreme Court has established three circumstances under which an inmate need not exhaust the administrative procedure as it is deemed unavailable: (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) when a procedure is "so opaque that it becomes, practically speaking, incapable of use;" or (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 578 U.S. at 643-644.   "Whether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law, even when it contains factual elements."   *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015).

The record fails to suggest that Mr. Stevenson's administrative remedies under Administrative Directive 9.6 were unavailable so as to excuse Mr. Stevenson's exhaustion requirement.   Mr. Stevenson appears to concede that inmates were able to file grievances, that grievances were being processed, and that the DOC adjudicated them, including during the relevant time period between July 1 and October 10, 2020.   *See Otero v. Purdy*, No. 3:19-CV-01688 (VLB), 2021 WL 4263363, at *10 (D. Conn. Sept. 20, 2021) (noting plaintiff's prior grievance filing demonstrated availability of administrative remedies). Indeed, Mr. Stevenson filed numerous grievances, both about the Phat Puffs Magazine Issues and about other subject matters.   *See* Pl.'s Additional Grievances at 3-4, 6-7, 9-10.   He could have included his Fourteenth Amendment complaints into his *Phat Puffs* grievances, but he did not.   His failure to do so does not mean the remedies were unavailable.

Because Defendants have shown that Mr. Stevenson's administrative remedies were available, but he nonetheless failed to exhaust his administrative remedies for his Equal Protection Claims under Administrative Directive 9.6, the Court grants the motion for summary judgment on the Fourteenth Amendment Claims.

> 2.    *Defendants' Second and Third Arguments: The Merits and Standing*

Given Mr. Stevenson failed to exhaust his Fourteenth Amendment Equal Protection Claims in compliance with the PLRA, the Court need not reach the merits of such claims.   *See Feaster v. U.S. Bureau of Prisons*, 37 F. App'x 15, 17 (2d Cir. 2002) (declining to review the merits of claims that failed on non-exhaustion

grounds). The Court notes that Mr. Stevenson has provided no comparator evidence that he was treated differently from a similarly situated inmate, nor that the DOC considered Mr. Stevenson's race in denying the *Phat Puffs Magazine* pages.   *See Diesel*, 232 F.3d at 103.   The content that was rejected has nothing to do with race at all, but rather involves sado-masochism and materials depicting sexual activity which involves the use of force.   Pl.'s Grievances at 5.   Indeed, the fact that undisputed evidence shows the DOC has permitted distribution of *Phat Puffs Magazine* in their entirety on other occasions and that the MRB's decisions are uniformly applied to all inmates is indicative that Mr. Stevenson's Equal Protection claims cannot survive summary judgment.

To the extent Mr. Stevenson contends *Phat Puffs Magazine* suffers from discriminatory treatment because it is a Black-owned business (versus purportedly white-owned *Letters to Penthouse*), he does not have standing to assert Equal Protection Claims on behalf of the company.   *See Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 358 (2d Cir. 2016).   In any event, the DOC's evidence shows that *Phat Puffs Magazine* is distributed at an equal or higher rate than *Letters to Penthouse*.   Defs.' Rule 56(a) at ¶ 48.

C.   <u>Official Capacity Claims</u>

The Court permitted Mr. Stevenson to proceed on his official capacity claims against Defendants Quiros, Martin, Santiago, Hartnett, and King seeking an injunctive order for DOC to provide him with his publications and stop rejecting his publications.   IRO at 10-12; Compl. at 9 (¶¶ 1-2).

30

As an initial matter, any claims for money damages against Defendants who are state employees, in their official capacities, are barred by the Eleventh Amendment. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 169 (1985).

The U.S. Supreme Court recognizes a limited exception to the Eleventh Amendment's grant of sovereign immunity from suit: when a plaintiff sues a state official acting in an official capacity for <u>prospective</u> injunctive relief for <u>continuing</u> violations of federal law. *See Ex parte Young*, 209 U.S. 123 155–56 (1908). Simply put, an injunctive relief against a state official in his official capacity only extends to an ongoing violation of the constitutional rights that will happen in the future. *See, e.g., Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 (2011). The exception to Eleventh Amendment immunity "does not permit judgments against state officers declaring that they violated federal law in the past." *See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy*, 506 U.S. 139, 146 (1993).

Because this Court grants motion for summary judgment on Mr. Stevenson's First Amendment claims based on the merits and his Fourteenth Equal Protection claims based on failure to exhaust administrative remedies, Mr. Stevenson cannot show a continuing violation of his rights under federal law. Accordingly, the Court grants the motion for summary judgment on Mr. Stevenson's official capacity claims against Defendants Quiros, Martin, Santiago, Hartnett, and King. *See Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 406-07 (S.D.N.Y. 2010) (requests for injunctive relief are remedies and are dismissed with the underlying claim).

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED.   The clerk is instructed to enter judgment in Defendants' favor and to close this case.

_____/s/_____

**Vanessa L. Bryant**
**United States District Judge**

**SO ORDERED at Hartford, Connecticut this 6th day May, 2022.**

**32**